**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NIKOLAOS KATSOLIS, PANAGIOTIS )
MATHESIS, EDWARD BARNACHEA )
FLORES, RICHARD DAGASDAS )
CABARUBIAS, SPYRO )
ADRAMITOGLOU, NIKOLAOS )
BOGIAKIS, NIKOLAOS VASTARTDIS )
NILO GANADILLO LUNETA, ALY )
HASSAN REFAEY HASSAN, DENNIS )
LIBERANDO VILLON, STAVROS )
LYMPERIS, JUANITO DUMAPAY STA. )
MARIA, MARIUS-OCTAVIAN DIUDEA- )
SINEA, CHRYSOSTOMOS PAGONIS, LEO )
ABUAN LAIGO, LESTER BALOG )       Case No: 1:19-CV-00616-RGA
MARASIGAN, NORMAN ARBOL )
MELGAZO, RONILO SALAZAR SEVILLA, )
LOPE CONSTANTINO TORRES, )
CHRISTIAN LOS BANES ANGURING, )
JOHN KIRBY NOVAL DOLDOLEA, DEN )
ISREAL MAHILIC, JESS TORNEA )
BENDICIO, MARK ANTHONY )
SUARNABA, JUELAR, ZALDY LARESMA )
REGALDILLO, MARLON CARINGAL )
AGBIING, FELMAR VALENCIA )
SANCHEZ, ABDOU SHEHATA BAHNASSI )
ASHRAF, VICTOR MICHAEL GALAN )
CABELLON, AR-JAY PINEDA CAUSAPIN, )
NINO DELA TORRE HERMONO, JEMAR )
BACASON SESON, and SAGIT GAFAR, )
)
        *Petitioners*, )
)
    v. )
)
KEVIN K. MCALEENAN *and* )
UNITED STATES COAST GUARD, )
)
        *Respondents*. )

**MEMORANDUM AND RETURN IN SUPPORT OF RESPONDENTS'
OPPOSITION TO THE PETITION FOR WRITS OF HABEAS CORPUS**

Respondents Kevin K. McAleenan and United States Coast Guard (collectively,

"Respondents" or "the government") oppose the pending Petition for Writs of Habeas Corpus Pursuant to 28 U.S.C. § 2241.[1] (D.I. 1.)

## INTRODUCTION

The premise of the habeas petition at issue is that thirty-three crewmembers are all similarly situated and are being involuntarily detained onboard the M/T EVRIDIKI, but neither is true. Even if they were previously involuntarily detained (which the government disputes), their habeas requests are moot. Four of the crewmembers were given permission to leave the United States and left the country on April 5, 2019. Eighteen of the crewmembers, meanwhile, are not being detained by the United States government, and have elected instead to remain onboard the vessel in order to abide by the terms of their contract with their employer. Indeed, the Security Agreement in question does not even mention these eighteen individuals, who have not "made a request to depart the vessel to . . . [any] government agency." (*See generally* U.S. Exhibit A (Security Agreement), attached.) With respect to the eleven remaining crewmembers, they are not presently being detained by the United States government. However, once paroled into the country, the United States is prepared to detain them pursuant to lawful arrest warrants signed by a Magistrate Judge. (*See* U.S. Exhibit B (Buck Suppl. Decl.) ¶ 2 (discussing parole approval); U.S. Exhibit C (Warrants; unsealed on April 11, 2019).)

To the extent these crewmembers attempt to thwart efforts to remove them from the

---

[1] The Court's Order of yesterday (D.I. 12) suggested that the government has previously briefed the issues raised in the petition. The government attorneys respectfully submit that they have not had prior occasion to address a habeas challenge in the context of a marine pollution prosecution, and, in fact, this habeas matter appears to be a new type of challenge to the United States' ability to prosecute such cases. Vessel owners and operators have brought other unsuccessful challenges, *see, e.g.,* A*ngelex Ltd. v. United States,* 723 F.3d 500 (4th Cir. 2013) and *Watervale Marine Co. v. U.S. Dep't of Homeland Sec.*, 807 F.3d 325 (D.C. Cir. 2015), however, this claim by the crew is novel.

vessel, they are voluntarily extending their detention and thus cannot bring a claim for habeas relief. To the extent petitioners seek to challenge the legality of the arrest warrants or the parole process, those issues fall far outside the scope of the instant petition.

In any event, even if petitioners' claims for habeas relief were cognizable, they would fail on the merits. Third Circuit precedent is unequivocally clear that individuals who have not been lawfully admitted to the United States—irrespective of their presence on United States soil—lack due process rights. It is undisputed that none of the petitioners has been lawfully admitted to the United States. Because the sole basis for the petition is an alleged violation of the Due Process Clause (D.I. 1, ¶¶ 56-58), the habeas petition must fail, as petitioners have no due process rights to vindicate in a habeas proceeding. Accordingly, the government respectfully requests that the petition be dismissed in its entirety.

## BACKGROUND

### I.     The M/T EVRIDIKI

The Liberian-flagged M/T EVRIDIKI (IMO #9318137) called at the Port of Wilmington on March 11, 2019. (D.I. 1, ¶ 1; D.I. 10-1, ¶ 3.) The EVRIDIKI is an ocean-going crude oil tanker owned by Liberian entities. (U.S. Exhibit A at 1.)[2]

On March 11, 2019, U.S. Coast Guard officials conducted a routine inspection onboard the EVRIDIKI. (D.I. 10-1, ¶ 3). Their findings led them to expand the examination. Ultimately, the Captain of the Port "determined there was reasonable cause to believe that the M/V EVRIDIKI, its owners, operators, or person in charge may be subject to a fine or civil penalty under 33 USC 1901 et. seq. and relevant regulations found in 33 CFR Subchapter O." (D.I. 1-3 (USCG COTP ltr. of Mar. 15, 2019).)

---

[2] D.I. 1-1 (Petitioners' Exhibit A) is a draft version of the same document.

## II. Statutory Backdrop: the United States' Treaty Obligations to Prevent Pollution at Sea (MARPOL) and Implementing Domestic Law (APPS)

### A. MARPOL

To provide context to the Court, set forth below is information concerning the 1973 International Convention for the Prevention of Pollution from Ships and the Protocol of 1978 Relating to the International Convention for the Prevention of Pollution from Ships, collectively called "MARPOL."

Ships like the EVRIDIKI generate oily bilge waste during ordinary operation. "'Bilge water' is a mixture of oil and water that accumulates in the 'bilge'—or bottom—of a ship." *United States v. Pena*, 684 F.3d 1137, 1142 n.2 (11th Cir. 2012). "All of the oil, fuel and other liquids that drip or leak from machinery during the ship's normal operation, and any seawater that leaks into the ship, ultimately flow downward into the bilge." *Id.* "To reduce the oil content to permissible levels, the bilge water must be pumped through a piece of equipment that filters the oil out of the water, commonly called an 'oily water separator.'" *Id.* at 1142 n.2. "If a ship's bilge water is not filtered through an oily water separator to reduce the oil content to permissible levels, then the bilge water must be collected and retained in tanks on the ship and discharged at a proper facility once the ship arrives in port." *Id.* Although the accumulated dirty bilge water must periodically be discharged "so that it does not rise to a level where it endangers the safety of the vessel and its crew," *id.*, the release of bilge water directly into the ocean poses an environmental hazard. Unlawful "operational discharges" of bilge waste put more oil into the world's oceans than do accidental discharges, accounting "for about 85 percent of all the oil entering the oceans from marine transportation operations." H.R. Rep. No. 96-1224 at 4 (1980), reprinted at U.S.C.C.A.N. 4849.

Aimed at preventing deliberate discharges, MARPOL was enacted "to achieve the complete elimination of intentional pollution of the marine environment by oil and other harmful substances and the minimization of accidental discharge of such substances." *Pena*, 684 F.3d at 1142. MARPOL prohibits a ship from dumping its bilge water into the ocean if the oil content of that water exceeds 15 parts per million (PPM). *See id.*

Annex I "mandates that vessels record all oil transfer operations, including the overboard discharge of bilge water, in an [Oil Record Book] that is kept on board and made available for inspection by the 'competent authority' of any government party to MARPOL." *United States v. Ionia Mgmt. S.A.*, 555 F.3d 303, 305 (2d Cir. 2009). MARPOL requires that member States prohibit violations of the treaty through domestic law that provides penalties "adequate in severity to discourage violations of [MARPOL]." *See* MARPOL, 1340 U.N.T.S. 61, 186.

Entries in the Oil Record Book must be signed by the officer in charge of the operation concerned, usually the chief engineer, and countersigned by the ship's master. *See* MARPOL, 1340 U.N.T.S. 61, 212. A foreign-flagged vessel must ensure that its Oil Record Book is accurate—or at least not knowingly inaccurate—when entering U.S. waters. *United States v. Jho*, 534 F.3d 398, 403 (5th Cir. 2008). A vessel operator that intentionally and illegally discharges oil into international waters obviously would not record the crime in the Oil Record Book, which would result in the vessel presenting a false Oil Record Book. *Id.* (citing 33 C.F.R. § 151.25 & 33 U.S.C. §§ 1901-15). *See Ionia Mgmt. S.A.*, 555 F.3d at 307-09; *Jho*, 534 F.3d at 404 ("[T]he 'gravamen' of the [criminal] action was 'not the pollution itself, or even the Oil Record Book violation occurring at that time, but the misrepresentation in port.'").

## B.      APPS

To effectuate MARPOL, Congress enacted APPS.  33 U.S.C. §§ 1901, *et seq*.

Enforcement of APPS is mandatory.  *See* 33 U.S.C. § 1903(a) ("Secretary shall administer and

enforce the MARPOL Protocol . . . .); § 1907(a) ("Secretary shall cooperate with other parties to

the MARPOL Protocol . . . in the detection of violations and in enforcement . . . ."); § 1907(b)

("Upon evidence that a violation has occurred, the Secretary shall cause the matter to be

investigated.").

If APPS is proven to have been violated, the EVRIDIKI would be directly liable *in rem*

for any penalty.  *See* 33 U.S.C. § 1908(d).  Recognizing that foreign-flagged vessels often make

only brief port calls in the United States, Congress—to enable investigation and prosecution and

to guarantee payment—authorized the Coast Guard to hold foreign-flagged vessels, like the

EVRIDIKI, in port "if reasonable cause exists to believe that the ship, its owner, operator or

person in charge may be subject to a fine or civil penalty" for violating APPS.  33 U.S.C.

§ 1908(e).

To hold a ship, the Coast Guard requests the Secretary of the Department of Homeland

Security (acting through Customs Border Protection (CBP)) to refuse or to revoke the clearance

to depart, without which a foreign vessel may not depart the port.  46 U.S.C. § 60105(b).

Clearance may subsequently be granted upon the filing of a bond or other surety satisfactory to

the Secretary of the Department of Homeland Security.[3]  *Id.*  Regulations provide that if the

---

[3] "The authority to grant clearance, originally vested in the Secretary of the Treasury, was subsequently transferred to the Secretary of Homeland Security, and then further delegated to Customs."  *Watervale Marine Co.*, 807 F.3d at 327 n.1 (citing 68 Fed. Reg. 28,323 (May 23, 2003)).

Coast Guard requests that CBP refuse or revoke the clearance for the reasons stated in § 1908(e), then CBP must do so.  *See* 19 C.F.R. § 4.66c(a).

The surety agreement acts as a substitute for the presence of the vessel by ensuring that jurisdiction will be retained over criminal defendants, and by guaranteeing that funds will be available to pay any civil or criminal penalty that may ultimately be assessed against the vessel's owner, operator, or person in charge.  Section 1908(e) authorizes the Coast Guard—but does not require it—to release a vessel, providing that "[c]learance may be granted upon the filing of a bond or other surety satisfactory to the Secretary."  *Id.*; *see also Watervale Marine Co.*, 807 F.3d at 330 (APPS "clearly provides authority in the Coast Guard to simply hold the ship in port until legal proceedings are completed.").

Section 1908(e) also grants the United States discretion to negotiate a surety arrangement that will allow the vessel to resume her voyage under conditions "satisfactory to the Secretary" of Homeland Security.  *Id.*  Commonly, the Coast Guard, exercising this authority, negotiates with a vessel owner or operator for both a monetary bond to secure the payment of any penalties ultimately imposed, and non-monetary conditions, such as agreements to submit to the jurisdiction of the courts of the United States and to ensure that crewmember witnesses are cared for until they testify.  These conditions substitute for the vessel's presence and facilitate criminal prosecution even after the ship has been allowed to leave U.S. waters.

## III.    The Security Agreement

Surety satisfactory was arranged between the Coast Guard and the EVRIDIKI's owner and operator on March 28, 2019.  (*See generally* U.S. Exhibit A.)  The Security Agreement identifies eleven crew members who potentially possess information relevant to the investigation:  (1) KATSOLIS, Nikolaos—Master; (2) VASTARDIS, Nikolaos—Chief

Engineer; (3) LUNETA, Nilo Ganadillo—First Assistant Engineer; (4) REFAEY, Hassan Aly

Hassan—Third Assistant Engineer; (5) VILLON, Dennis Librando—Third Assistant Engineer;

(6) STA. MARIA, Juanito Dumapay—Third Assistant Engineer; (7) REGADILLO, Zaldy

Laresma, Julius—Oiler; (8) SANCHEZ, Felmar Valencia—Wiper; (9) AGBING, Marlon

Carnigal—Wiper; (10) GAFAR, Sagit—Fitter; (11) DIUDEA-SINEA, Marius-Octavian—

Electrician. (U.S. Exhibit A, ¶ 3.) Per the terms of the Security Agreement, the EVRIDIKI may

not sail with these persons onboard. (*Id*., ¶ 3(c).) The EVRIDIKI's departure clearance was

restored on March 29, 2019. (*See* D.I. 10-1, ¶ 5; D.I. 10-3.)

The Security Agreement recognizes that the crewmembers themselves are not parties to

the agreement between the government and the owner and operator of the EVRIDIKI. (*See* U.S.

Exhibit A, ¶ 7 (acknowledging that the agreement does not bind third-parties)). It also

acknowledges that the owner and operator do not have "complete control over the ship's officers

and crewmembers," and it expressly preserves crewmember rights. (*Id*., ¶ 5.) The agreement

provides that the obligations of the owner and operator are "subject to all rights of each ship's

officer and crewmember as may be asserted by the ship's officer or crewmember or by any

attorney working on his behalf." (*Id*., ¶¶ 5, 6.) Further, the crewmembers' "rights pursuant to 18

U.S.C. § 3144, F.R.Crim.P. Rule 15 and other federal laws are specifically preserved." (*Id*., ¶ 7.)

As discussed, a significant purpose of the Security Agreement is to ensure that

crewmembers who remain in the United States are adequately provided for. In prior cases,

without a security agreement in place, owners and operators suspected of criminal activity have

gone so far as to cancel crew members' employment contracts, stranding crew members abroad.

*See Giuseppe Bottiglieri Shipping Co. SPA v. United States*, No. 12-59 (S.D. Ala., Feb. 7, 2012),

D.I. 24-3, Ex. B, at 10-11 (Operator notified eight crewmembers that their contracts were being

rescinded and that all expenses, including lodging and food, would soon become their personal responsibility).  In security agreements, therefore, the government ensures that while crewmembers remain in the United States, the vessel owner or operator will provide reasonable lodging, a meal allowance, health coverage and wages to the ship's crew.  (*See* U.S. Exhibit A, ¶ 3.)  These terms substitute for the presence of the vessel, which would otherwise be available to house, feed, and compensate the crew.

Similarly, by custom and by contract, the vessel owner or operator usually returns crewmembers to their own country of hire.  Surety terms requiring repatriation are included in security agreements at the government's insistence to ensure that crewmembers are not stranded far from home.  (*See id*.)

Perhaps as a result of these provisions, crewmembers ordinarily choose to remain in the United States voluntarily.  *See, e.g., United States v. Target Ship Mgmt. PTE Ltd*., Crim. No. 11-368 (S.D. Ala. Jan. 13, 2012), D.I. 77 (denying vessel operator's motion to take Fed. R. Crim. P. 15 depositions because the crew wished to remain in the United States).

## IV.    Status of the EVRIDIKI's Crew

Although the EVRIDIKI has a departure clearance, it remains in port because its owner and operator agreed that it would not sail with eleven of the petitioners on board who are believed to have information relevant to the government's investigation.  (U.S. Exhibit A, ¶ 3.)

The EVRIDIKI has a crew of thirty-three.  (D.I. 1, ¶¶ 2-34 (listing petitioners' names, nationalities, and marital status); D.I. 1-2 (Crew List).)  As mentioned, four left the country on April 5, 2019.[4]  (D.I. 11-2 (Pet. Ex. B, Opp'n U.S. Mot. Ext.) at 3 ("I note finally that the

_____

[4] Four M/T EVRIDIKI crewmembers having no connection to the investigation reached the end of their employment contracts, were granted permission to disembark the EVRIDIKI, and departed the United States via Qatar Airlines Flight #728 on April 5, 2019:  (1)

government has permitted four of my clients[,] Mssrs. Cararubias, Anguring, Bendicio and Gabellon, to disembark the vessel, travel under guard to the Philadelphia airport, and return to the Philippines.  They did so last Friday.  In route, each authorized me to dismiss the petition as to him.").)

Eighteen remain aboard the ship because that is where they work.  If they genuinely want to leave the United States immediately, they are free to break their employment contracts and can leave the country, as did the other four.

As to the remaining eleven crew members, the Department of Homeland Security has now authorized Significant Public Benefit Paroles (SPBP) (discussed in the government's earlier brief (D.I. 9 (U.S. Mot. Ext.) at 5-6)) for all eleven, so they can be paroled into the United States.  (*See* U.S. Exhibit B (Buck Suppl. Decl.), ¶ 2.)  The United States has obtained a complaint and arrest warrant with respect to one of them.  (Exhibit C at 1.)  Material witness arrest warrants have been signed as to the remaining ten.  (*Id.* at 2-11.)

## V.     The EVRIDIKI Cannot Depart Until It Has Sufficient Replacement Crew Onboard, Which Has Not Yet Occurred

"The International Convention for the Safety of Life at Sea (SOLAS) is a maritime treaty that establishes uniform regulations and standards for vessels that regularly travel in international waters."  *United States v. Gonzalez*, 540 F. App'x 967, 969 (11th Cir. 2014) (citing 32 U.S.T. 47, T.I.A.S. 9700).  SOLAS regulates the construction and equipment of ships, surveys and certification, safety of navigation and control inspections.  The standard for minimum safe manning is set forth in SOLAS, Chapter V, Regulation 14.  Discretion on how many crewmembers are necessary is left to the flag state as set forth in a Minimum Safe Manning

---

ANGURING, Christian Los Banes; (2) BENDICIO, Jess Tornea; (3) CABARUBIAS, Richard Dagasdas, and (4) CABELLON, Victor Michael Galan.  (D.I. 10-1, ¶ 13.)

document issued to the vessel.

In addition, the International Convention on Standards of Training, Certification and Watchkeeping for Seafarers, 1978, as amended (STCW), S. Treaty Doc. No. 96-1, C.T.I.A. No. 7624, provides international standards for competency and certification of seafarers to ensure safety of life and property at sea and protection of the marine environment. Specifically, Annex Chapter I; Regulation I/14 sets forth the "responsibilities of companies" by establishing that companies are required to ensure that "its ships are manned in compliance with the applicable safe manning requirements of the Administration."

It is the government's understanding that, although efforts are being made to do so, the EVRIDIKI's Owner and Operator have yet to bring replacement crew to the vessel. (*See* U.S. Exhibit B, ¶ 3 ("[T]he relief crew is scheduled to arrive on April 12, 2019. The pass down typically takes one full day.").) Until this occurs, the EVRIDIKI cannot sail.

## DISCUSSION

### I. Federal Officials Are Investigating Potential Violations of U.S. Law, Which Occurred in the United States

As an initial matter, petitioners are wrong to suggest that the Coast Guard is investigating events that "may have occurred outside the United States" and "would have violated only Liberian law." (D.I. 1 at 13 ("Had the suspected events occurred the events would have violated only Liberian law."); s*ee also* D.I. 11 at 12.) ("[N]o pollution could have occurred in this country.").)

As set forth in MARPOL, APPS mandates that certain vessels, including EVRIDIKI, maintain an Oil Record Book. *See* 33 C.F.R. § 151.25. A ship's Oil Record Book must contain, among other things, an accurate record of discharges of bilge water, sludge, and oily mixtures. *See* 33 C.F.R. § 151.25(d). The Oil Record Book must be kept readily available for inspection at

all reasonable times. *See* 33 C.F.R. § 151.25(i). The Coast Guard's inspection authority includes the ability to examine a ship's Oil Record Book. *See* 33 C.F.R. § 151.23(c). When a vessel's crew unlawfully dumps oily waste in violation of MARPOL, they do not put themselves on report by recording the event in the vessel's Oil Record Book. Instead, the required entries are omitted or falsified.

The EVRIDIKI's presentation of a false Oil Record Book to Coast Guard inspectors on waters of the United States or in one of its ports constitutes a violation of APPS.[5] Recall that a person who knowingly violates APPS or its attendant regulations commits a Class D felony. *See* 33 U.S.C. § 1908(a). Related crimes may also be at issue. This is the crux of the government's investigation, not a violation of another country's law that took place on the high seas.

The petition is equally incorrect in asserting that if authorities in the United States find evidence that MARPOL and APPS have been violated aboard a foreign vessel in United States waters, their only recourse is to send a report to the nation of the vessel's registration, here, Liberia. (*See* D.I. 1, ¶ 14.) The United States has both jurisdiction and statutory authority to prosecute violations of MARPOL. *See, e.g.*, 33 U.S.C. § 1908(a), (b) (imposing civil and criminal penalties for MARPOL violations). Likewise, MARPOL discusses actions to be taken when violations of the MARPOL Convention are found to occur and provides: "Any violation of the requirements of the present Convention within the jurisdiction of any Party to the Convention shall be prohibited and sanctions shall be established therefor under the law of that

---

[5] *See Ionia Mgmt. S.A.*, 555 F.3d at 309 (holding that "the APPS's requirement that subject ships 'maintain' an [Oil Record Book or] ORB, 33 C.F.R. § 151.25, mandates that these ships ensure that their ORBs are accurate (or at least not knowingly inaccurate) upon entering the ports or navigable waters of the United States"); *Jho*, 534 F.3d at 403 ("[W]e read the requirement that an oil record book be 'maintained' as imposing a duty upon a foreign-flagged vessel to ensure that its oil record book is accurate (or at least not knowingly inaccurate) upon entering the ports of navigable waters of the United States.").

Party.  Whenever such a violation occurs, that Party shall either:  *Cause proceedings to be taken in accordance with its law*; or [f]urnish to the Administration of the ship such information and evidence as may be in its possession that a violation has occurred.")  1340 U.N.T.S. 61, 185-86 (emphasis added & paragraph structure omitted).  Moreover, MARPOL itself requires the penalties imposed by a State party's domestic law to be "adequate in severity to discourage violations" of MARPOL.  MARPOL at Art. 4(4), 1340 U.N.T.S. at 186.

## II.     Changed Factual Circumstances Preclude Petitioners From Having a Claim For Habeas Relief.

Petitioners' counsel does not dispute that as to the four crewmembers who left both the vessel and the United States, their claims should be dismissed.[6]  The remaining crewmembers can be divided into two groups.  Eighteen of the crewmembers are not listed in or part of the Security Agreement and are not being detained by the United States in any way.  Instead, they appear to have elected to remain onboard the vessel, presumably to continue working and to avoid breaking their employment contracts.  (*See* D.I.10-1 (Buck Decl.), ¶ 13.)  Tellingly, the petition is silent as to how these crewmembers are being detained by the government.  Although the petition alleges that "the vessel may not depart until" the eleven crewmembers mentioned in the Security Agreement are paroled (D.I. 1, ¶ 40), the same is not true of the eighteen crewmembers, who are free to leave the vessel, but appear to have made the conscious decision to remain onboard to avoid breaching their employment contracts.  (*See* D.I. 10-1, ¶ 13.)  That choice forecloses their ability to obtain habeas relief.  It is well-settled that a petition for habeas

---

[6] *See* D.I. 11-2 (Pet. Ex. B, Opp'n U.S. Mot. Ext.) at 3 ("I note finally that the government has permitted four of my clients[,] Mssrs. Cararubias, Anguring, Bendicio and Gabellon, to disembark the vessel, travel under guard to the Philadelphia airport, and return to the Philippines.  They did so last Friday.  In route, *each authorized me to dismiss the petition as to him*.") (emphasis added).)

corpus is only viable upon a showing that individuals are in "custody." 28 U.S.C. § 2241(c).

Even if the eighteen crewmembers' decision to remain on the boat could be deemed "custody" for purposes of habeas corpus, which the government disputes, their purported "custody" is entirely self-inflicted. *See Pelich v. I.N.S.*, 329 F.3d 1057, 1061 (9th Cir. 2003) ("[Petitioner] cannot legitimately object to his continued detention when that very detention is caused by his own conduct."); *Moore v. Dir. of the Bureau of Immigration & Customs Enf't, No*. 09-13207, 2009 WL 3568638, at *2 (E.D. Mich. Oct. 30, 2009) ("[Petitioner's] extended stay at the Wayne County jail is his own making. His detention is not, therefore, unlawful."); *Olajide v. B.I.C.E.*, 402 F. Supp. 2d 688, 689 (E.D. Va. 2005) ("[L]ike the orphan who sought sympathy after murdering his parents, petitioner cannot claim that his pre-removal detention is unreasonably long when he is the cause of the delay in his removal."). And, once the eleven crewmembers subject to the parole process disembark, the vessel and all remaining crewmembers are free to depart pursuant to the Security Agreement. (*See* D.I. 10-1, ¶ 12.)

Similarly, to the extent the eleven crewmembers mentioned in the Security Agreement refuse to cooperate with parole efforts, they too lack a basis for habeas relief, as they are no different than an alien attempting to thwart his or her release. *See Munaf v. Geren*, 553 U.S. 674, 693-94 (2008) ("[T]he nature of the relief sought by the habeas petitioners suggests that habeas is not appropriate in these cases. Habeas is at its core a remedy for unlawful executive detention. But here the last thing petitioners want is simple release; that would expose them to apprehension … for criminal prosecution[,] precisely what petitioners went to federal court to avoid."); *see also Pelich*, 329 F.3d at 1061; *Moore*, 2009 WL 3568638, at *2.

Petitioners appear to contend that even if the eleven crewmembers cooperate with the parole process that they still have cognizable habeas claims. This court should reject petitioners'

contention. First, because the eleven crewmembers in question have been issued arrest warrants which communicate the legal basis for their detention pursuant to those warrants, petitioners lack a habeas claim based solely on the alleged impropriety of those warrants. *See, e.g.*, *Workman v. Cardwell*, 471 F.2d 909, 910-11 (6th Cir. 1972). And to the extent that petitioners want to challenge those warrants, they will be provided an opportunity to do so in front of a magistrate judge. Second, and more importantly, these claims are not made in the petition, which again is confined to the legality of the detention on-board the vessel, not the legality of any aspect of the parole process. *See, e.g.*, *Ifenatuora v. Holder*, No. 4:09-CV-153 CDL, 2010 WL 2688878, at *4 (M.D. Ga. Apr. 27, 2010) ("The court is not required to address an issue not raised in Petitioner's original complaint.").[7]

In sum, given the choices of each crewmember, and availability of parole as a means to end the presence on the vessel with respect to the eleven crewmembers who are mentioned in the Security Agreement, none of the crewmembers is presently being unlawfully detained in the "custody" of the United States on-board the vessel. This, by itself, suffices to deny the petition in its entirety.

## III. Petitioners Have No Due Process Rights to Vindicate Via Their Habeas Petition.

If this Court were to reach the merits of the petition, dismissal is still warranted because none of the petitioners have due process rights since they are aliens on the threshold of entry to the country and have not been lawfully admitted into the United States. As an initial matter, the petition notes that each of the petitioners save one possesses a valid visa to enter the United States. (*See* D.I. 1, ¶¶ 42, 47.) But to the extent petitioners attempt to argue that the existence of

---

[7] Although the petition generically objects to the arrangement codified in the Security Agreement (*see* D.I. 1, ¶¶ 40, 42), it does not specifically elucidate how or why the parole process would constitute an unlawful detention sufficient to warrant habeas relief.

visas, by itself, allows petitioners to invoke the Due Process Clause, this assertion conflates the issuance of a visa with the right to actually be lawfully admitted into the United States. It is well-settled that CBP officials possess discretion to refuse the entry of individuals who possess visas to enter the country. *See* 8 U.S.C. § 1201(h) ("Nothing in this chapter shall be construed to entitle any alien, to whom a visa or other documentation has been issued, to be admitted [to] the United States."); *Sarsour v. Trump*, 245 F. Supp. 3d 719, 732 (E.D. Va. 2017) ("Section 1201(h) makes clear that while clearly related, the process of issuing a visa, and the rules and regulations related thereto, involves an aspect of the immigration process that is separate and distinct from the process of actually permitting entry into the country."); *Am. Immigration Lawyers Ass'n v. Reno*, 18 F. Supp. 2d 38, 57 (D.D.C. 1998) ("A consular officer's issuance of a visa does not by itself authorize an alien to enter the United States. It does no more than entitle [the] alien to present himself at a port of entry to prove his admissibility.").

Nor is there any doubt that CBP officials possess authority and discretion to both detain aliens pursuant to their inspection authority, and to refuse entry to holders of valid visas. Section 1225(a)(1) of Title 8 states that an "alien present in the United States who has not been admitted or who arrives in the United States (… including an alien who is … interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission," and other statutes provide broad authority for CBP officials to board and inspect vessels. *See* 8 U.S.C. § 1225(d)(1); 19 U.S.C. § 1467; 19 U.S.C. § 1581; *see also* 8 C.F.R. § 252.1(a). The same is true of CBP authority to parole alien seafarers into the United States on a temporary and case-by-case basis. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 252.1(d). The petition argues that because none of the petitioners fall into any of the categories enumerated in 8 U.S.C. § 1182 that no "valid immigration concern" is presented. (D.I. 1, ¶ 55.) This argument once again

confuses eligibility to receive visas with permission to lawfully enter the country. 8 U.S.C. § 1182(a) provides that certain individuals are "ineligible to receive visas and ineligible to be admitted to the United States." That the vast majority of petitioners are not covered by the provision is apparent because most of them procured visas to enter the United States. However, the specific aliens excluded from entry in 8 U.S.C. § 1182 does not constitute an exhaustive list of individuals that CBP officials may prevent from entering the United States. Instead, even when an individual has a visa, "an inspecting officer can and must refuse admission if a visa holder fails to establish to the inspector's own satisfaction that the visa holder fulfills the requirements for the classification which his visa bears" independent of the suspension of entry imposed by 8 U.S.C. § 1182. *Am. Immigration Lawyers Ass'n*, 18 F. Supp. 2d at 57.

The crux of the petition is that the "core of liberty protected by the Due Process Clause" is being violated. (D.I. 1, ¶ 57.) But because none of the petitioners have been lawfully admitted into the United States, they have no due process rights beyond what Congress has statutorily provided. *See Osorio-Martinez v. Atty. Gen. United States of Am.*, 893 F.3d 153, 168 (3d Cir. 2018) ("We [have held] that although physical presence in the country for any duration may be relevant … presence alone, particularly of short duration, cannot be sufficient to establish that an alien is entitled to constitutional protections, especially given Congress' and the Executive's plenary power over decisions regarding the admission or exclusion of aliens." (internal quotation omitted)); *Castro v. U.S. Dep't of Homeland Sec.*, 835 F.3d 422, 443 (3d Cir. 2016) ("[A]liens on the threshold of initial entry stan[d] on different footing: [w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned." (internal quotation omitted)).

In *Castro*, the Third Circuit considered the question of whether an alien subject to expedited removal proceedings could invoke the Suspension Clause, resoundingly answering the question in the negative. *See Id.* § 448-49. Beginning with the proposition that "the power to expel or exclude aliens [i]s ia fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control," *id.* at 439, the Third Circuit explicitly rejected the notion that because the petitioners in *Castro* were present in the United States that they were automatically protected by the Due Process Clause: "[T]he Supreme Court has suggested in several . . . opinions that . . .entrants like Petitioners do not qualify for constitutional protections based merely on their physical presence alone . . . . At a minimum, we conclude that all of these cases call into serious question the proposition that even the slightest entrance into this country triggers constitutional protections that are otherwise unavailable to the alien outside its borders." *Id.* at 448. Critically, *Castro* eschewed reliance on the very cases petitioners rely on, namely *Zadvydas v. Davis*, 533 U.S. 678 (2001), *Plyler v. Doe*, 457 U.S. 202 (1982), and *Matthews v. Diaz*, 426 U.S. 67 (1976), *see* D.I. 1, ¶ 56, for the simple reason that these cases "did not involve aliens who were seeking initial entry to the country or who were apprehended immediately after entry. And as for the cases that *did* involve arriving aliens, the [Supreme] Court rejected the aliens' efforts to invoke additional protections based merely on their presence in the territorial jurisdiction of the United States." *Castro*, 835 F.3d at 447 (emphasis in original). As for the other cases that petitioners invoke, they only serve to buttress the Third Circuit's conclusion that aliens who have not been lawfully admitted into the United States lack due process rights. (*See* D.I. 1, ¶ 56 (citing *Landon v. Plasencia*, 459 U.S. 21 (1981) and *Wong Wing v. United States*, 163 U.S. 228 (1896).) *But see Castro*, 835 F.3d at 445 ("[T]he Supreme Court has unequivocally concluded that 'an alien seeking initial admission to the

United States requests a privilege and has no constitutional rights regarding his application.'" (quoting *Landon*, 459 U.S. at 32)); *id.* at 449 n.32 (noting that *Wong Wing* did not alter the conclusion reached because although "the political branches' power over immigration is subject to important limits in some contexts by no means requires that the exercise of that power must be subject to judicial review in all contexts"). Thus for aliens standing "on the threshold of initial entry," "[w]hatever the procedure authorized by Congress is, it is due process." *Id.* at 443.

Straightforward application of *Castro* compels the conclusion that petitioners have no right to habeas relief based on the Due Process Clause. Although they are within the territorial limits of the United States, none of the petitioners has been lawfully admitted into the United States, and it is admission status, rather than presence, that is determinative of the measure of constitutional rights that the petitioners possess. *See id.* at 447-49. Seeking to avoid this conclusion, petitioners argue that "[n]one of the Petitioners wish to or is applying to enter the United States." (D.I. 11 at 3.) But even accepting this assertion as true, it is irrelevant, because as long as the petitioners are not lawfully admitted into the United States, they have not developed ties with the United States that warrant application of the Due Process Clause. *See United States v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Landon v. Plasencia*, 459 U.S. 21, 32 (1982) ("[O]nce an alien gains admission to our country and begins to develop the ties that go with permanent residence his constitutional status changes accordingly.") (emphasis added); *Osorio-Martinez*, 893 F.3d at 168; *Castro*, 835 F.3d at 448. Because petitioners do not have those ties, it makes no difference whether they formally intend to apply for admission or not as long as they

remain unadmitted aliens, especially as the parole process is the pathway the government has offered for them to leave the ship.

Nor does it matter that the eleven crewmembers are being allowed to "land temporarily" through the parole process, 8 C.F.R. § 252.1(d), as that process does not equate to lawful admission. *See Leng May Ma v. Barber*, 357 U.S. 185. 190 (1958) ("The parole of aliens … is simply a device through which needless confinement is avoided while administrative proceedings are conducted. It was never intended to affect an alien's status."); *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 215 (1953) ("[S]uch temporary harborage, an act of legislative grace, bestows no additional rights."); *Castro*, 835 F.3d at 448; *M.S.P.C. v. U.S. Customs & Border Prot., 60* F. Supp. 3d 1156, 1173, 1175 (D.N.M. 2014). In short, because petitioners are aliens deemed to be outside our borders and "seeking initial admission to the United States," they "cannot invoke the Constitution . . . in an effort to force judicial review beyond what Congress has already granted them." *Castro*, 835 F.3d at 443, 446.

Because petitioners have neither gained lawful admission to the United States nor developed the requisite ties with the United States, they have no due process rights "beyond what Congress has already granted them," *Castro*, 835 F.3d at 446. And since the statutory authority to inspect and detain petitioners for violations of United States law is well-settled, *see* Background Section II, *supra*, the petition must be dismissed.

## **CONCLUSION**

Based on the foregoing, Respondents respectfully request that the petition seeking writs of habeas corpus be dismissed in its entirety.

Dated: April 11, 2019                    Respectfully submitted,

DAVID C. WEISS
United States Attorney

/s/Jennifer L. Hall
Jennifer L. Hall (#5122)
Assistant United States Attorney
1313 N. Market Street
P.O. Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277
jennifer.hall@usdoj.gov


JOSEPH H. HUNT
Assistant Attorney General

/s/ Michael A. DiLauro
MICHAEL A.  DiLAURO
Senior Admiralty Counsel
Aviation & Admiralty Litigation
Torts Branch, Civil Division
U.S. Department of Justice
(overnight courier)
175 N St., N.E., Ste. 8.1815
Washington, D.C. 20002
(mailing)
P.O. Box 14271
Washington D.C. 20044-4271
Telephone: (202) 616-4047
Facsimile: (202) 616-4159
michael.dilauro@usdoj.gov


WILLIAM C. PEACHEY
Director

EREZ REUVENI
Assistant Director

/s/ Archith Ramkumar
ARCHITH RAMKUMAR
Trial Attorney
Office of Immigration Litigation
District Court Section
United States Department of Justice
P.O. Box 868, Ben Franklin Station

Washington, D.C. 20044
Telephone: (202) 598-8085
Facsimile:  (202) 305-7000
Archith.Ramkumar@usdoj.gov