## UNITED STATE DISTRICT COURT
## DISTRICT OF DELAWARE

NIKOLAOS KATSOLIS, PANAGIOTIS )
MATHESIS, EDWARD BARNACHEA )
FLORES, RICHARD DAGASDAS )
CABARUBIAS, SPYROS )
ADRAMITOGLOU, NIKOLAOS )
BOGIAKIS, NIKOLAOS VASTARDIS, )
NILO GANADILLO LUNETA, ALY )
HASSAN REFAEY HASSAN, DENNIS )   **CASE No: 1:19-CV-00616-RGA**
LIBRANDO VILLON, STAVROS )
LYMPERIS, JUANITO DUMAPAY STA. )
MARIA, MARIUS-OCTAVIAN DIUDEA- )
SINEA, CHRYSOSTOMOS PAGONIS, LEO )
ABUAN LAIGO, LESTER BALOG )
MARASIGAN, NORMAN ARBOL )
MELGAZO, RONILO SALAZAR SEVILLA, )
LOPE CONSTANTINO TORRES, )
CHRISTIAN LOS BANES ANGURING, )
JOHN KIRBY NOVAL DOLDOLEA, DEN )
ISRAEL MAHILAC, JESS TORNEA )
BENDICIO, MARK ANTHONY )
SUARNABA JUELAR, ZALDY LARESMA )
REGADILLO, MARLON CARINGAL )
AGBING, FELMAR VALENCIA )
SANCHEZ, ABDOU SHEHATA BAHNASSI )
ASHRAF, VICTOR MICHAEL GALAN )
CABELLON, AR-JAY PINEDA CAUSAPIN, )
NINO DELA TORRE HERMONO, JEMAR )
BACASON SESCON, and SAGIT GAFAR, )
  )
  *Petitioners,* )
  )
v. )
  )
  )
KEVIN K. MCALEENAN and )
UNITED STATES COAST GUARD, )
  )
  *Respondents* )

## PETITIONERS' REPLY IN SUPPORT OF
## APPLICATION FOR ORDER TO SHOW CAUSE
## IN SUPPORT OF PETITION FOR WRIT OF HABEAS CORPUS

**INTRODUCTION AND ADDITIONAL FACTUAL INFORMATION**

All Petitioners other than Petitioner Vastardis submit the following reply to the Respondent's Memorandum in opposition to Petitioners' request for habeas relief.

Respondents' Memorandum includes a number of mistaken factual assertions, including the false assertion that Petitioners have never been, and are not currently, detained by the United States. Filed herewith are documents showing that the Petitioners have been and are in the custody of the government and the Respondents:

1. Security Plan Overview and Minimum Standards for Contract Security Services. **EXHIBIT A.** The plan states that it was prepared "[a]t the direction of United States Customs and Border Protection (CBP)," applies "at anchorage or dockside in the ports of Pennsylvania, New York, New Jersey, Delaware, and surrounding locations," and requires "security guards" who will "prevent an unauthorized disembarkation by any detainees. . . ." Ring Maritime Services continues to communicate with CBP and to restrict the Petitioners from disembarking without permission of CBP, which has not been granted.

2. Electronic correspondence from the Ship's Agent, dated April 12, 2019, confirming that he understood from government officials that the entire crew "was detained onboard" and that, except for the four crewmembers whom the government permitted to depart, his understanding remains that the remaining crew "are detained onboard." **EXHIBIT B**.

3. CBP Form I-418 entitled "PASSENGER LIST - CREW LIST", documenting that the entire crew was "REFUSED." **EXHIBIT C**. By Coast Guard regulation, such crewmembers are detained onboard and the Captain is required to so detain them. 8 CFR § 235.3. As paragraph 43 of the verified Petition for Writs of Habeas Corpus states,

when CBP personnel denied the crew entry they stated, that the crew was "detained on board."

4. Electronic correspondence dated March 26, 2019, summarizing the conditions imposed on the four crewmembers who were granted permission to disembark, including the requirement that they be taken under guard to CBP offices and then to the airport for an international flight, making clear they were not free to leave, but granted special and limited permission. **EXHIBIT D**; and

5. Electronic messages from the crews' counsel dated March 20, March 22, and April 23, 2019, documenting that the crew and their counsel were told that the entire crew was and is detained by the CBP at the request of the Coast Guard and requesting that they be allowed to depart. **EXHIBITS E-1, E-2, AND E-3** respectively. As with the similar electronic messages attached to Petitioners' Opposition to Respondents' Motion to Extend Time, the Respondents and their counsel did not respond to these messages.

Respondents' assertions that any Petitioner (other than the four who departed) is not detained are clearly mistaken. Petitioners' counsel has sent several electronic mail messages to Respondents' counsel requesting that they correct the record in light of the facts and attached exhibits.

After the Court denied Respondents' Motion to Extend Time, Respondents sought and obtained *ex parte* material witness warrants against ten Petitioners. The applications (Exhibits G and H hereto) did not disclose that Petitioners were in custody and that their status was the object of a proceeding before this Court scheduled for hearing on April 15. The applications also did not disclose that the ten Petitioners had already agreed to accept, had accepted and had promised to honor subpoenas to testify before the grand jury, while also offering, and requesting an opportunity, to testify in advance of that proceeding. Most of them plainly have no relevant

information, and they had sought to offer prompt testimony so any doubt in that regard could be efficiently eliminated.

With due respect to the Magistrate Judge who issued the warrants, the applications did not make out the showing required for material witness warrants, i.e., that subpoenas would be ineffective to secure the Petitioners' testimony or that their testimony would be material. Remarkably, one of the Petitioners for whom an arrest warrant has been issued, Sagit Gafar, was not even *mentioned* in the supporting affidavit. Unlike the other Petitioners whose arrest has been ordered, Mr. Gafar was never interviewed by the Coast Guard onboard the vessel. While there is virtually no evidence that any of the Petitioners have information truly material to the hurriedly-filed criminal complaint for which these supposed witnesses are to be arrested, there is *no evidence* that Mr. Gafar has any relevant knowledge. He in fact has none. Like the other Petitioners, Mr. Gafar is an honorable, hard-working, honest, foreign seaman and family man. The sole Romanian on the vessel, Mr. Gafar is a quiet married gentlemen, with a child. He has been and is deeply troubled by the prospect of being forced ashore as human collateral and kept from his wife for an extended period. He has suggested these developments are likely the end of his long maritime career, as he finds the stress of an involuntary, senseless, indefinite separation from his family deeply troubling. At his request, counsel has sought and is seeking the assistance of the Romanian consulate.

As previously documented, Petitioners have made clear throughout that they are available to offer reasonable cooperation. They offered to provide sworn testimony weeks ago. Although they remain available to provide reasonable cooperation, they continue to object to Respondents' unlawful tactics, including treating them as human collateral. They respectfully ask this Honorable Court to protect their basic human right to freedom and to allow them to meet any responsibilities as witnesses without being detained or held in custody, subjected to restrictions

on their ability to travel, including to travel home, or to work and without any requirement that they be subjected to the unlawful agreement on security.

Citing a single example, Respondents' memorandum asserts that crewmembers pledged as human collateral "ordinarily choose to remain in the United States voluntarily." That is not counsel's experience. Some crewmembers from other vessels have been willing to spend extended periods in the United States because the government has advertised, including on YouTube, that it offers a "bounty" for MARPOL whistleblowers. Counsel's experience, however, is that most crewmembers prefer to spend time furthering their careers and with their families. Most seafarers, however, have been willing to return to testify as needed. Seafarers' visas to enter the United States are important to their careers; and, as a class, they are genuinely concerned about the ocean environment in which they work. Over the last year, attorney MacColl has helped crewmembers detained under agreements on security in Maine, Louisiana, California, Pennsylvania and Delaware. The crewmembers generally had not been told (by prior counsel or otherwise) that the agreements on security pledging them as collateral were of questionable legality.

Moreover, government officials go to extraordinary lengths to prevent crewmembers pledged as human collateral from exercising their rights and to punish those who insist on their rights. For example, attached hereto as **EXHIBIT F** is an Order entered in the District of Maine, granting whistleblower awards over the government's objection to three crewmembers pledged as collateral. As the Order documents, one of the crewmembers, Jaroslav Hornof, discovered a scheme for illegal discharges, "reported it to his captain," and was "responsible for stopping" it. His brave actions "endangered himself and jeopardized his career." Although "the information he provided formed the basis for the charges in the indictment" against his employer, the government sought to deny him a whistleblower award by structuring the plea agreement so that

the entire $3.2 million fine was allocated to a single obstruction of justice count (rather than the APPS/MARPOL counts, which allow awards). When the district court rejected that plea agreement as unfair to Mr. Hornof, the government restructured the agreement to allocate $500,000 to an APPS/MARPOL count, but objected to Mr. Hornof and the other witnesses receiving awards because (a) Mr. Hornof first reported the discharges, none of which violated U.S. law, to his Captain, then his employer, and then the MARPOL Administration, before reporting the matter to the Coast Guard when the vessel next arrived here and (b) Mr. Hornof insisted on his right to return home, especially after his pregnant wife's mother died, although he proposed to return as needed for testimony.

In addition to those and other factual errors, Petitioners respectfully correct the following of Respondents' many mistaken legal arguments:

1. Relying on decisions that address the due process rights of aliens *seeking admission*, Respondents mistakenly argue that aliens not yet granted lawful entry have no due process rights in any context, including for relief from unlawful detention, from administrative action requiring them to enter the United States, or from contracts pledging them as human collateral; and

2. Respondents mistakenly argue that a petitioner in custody pursuant to a material witness arrest warrant may not challenge the lawfulness of the warrant in a habeas proceeding and that the issuance of a warrant preempts a pending habeas petition.

## DISCUSSION

### I. Petitioners Have Due Process Rights.

The government cites *Osorio-Martinez v. AG US*, 893 F.3d 153, 159 (3d Cir. 2018), and *Castro v. US Dep't of Homeland Sec*., 835 F.3d 422, 448-49 (3d Cir. 2016), for the proposition that aliens not yet admitted to the United States have no due process rights, apparently under any

circumstances. Therefore, argues the government, foreign crewmembers arriving lawfully have no right to seek habeas relief if they are detained or imprisoned indefinitely, pledged as human collateral for the release of a detained vessel, or directed to enter the United States involuntarily, all of which have occurred here. *Osorio-Martinez* and *Castro* instead relate exclusively to an alien's limited right to object or to seek judicial review of immigration control matters designed to *prevent* entry. They involved *removal* orders against aliens who tried to cross the border and seek asylum. As "surreptitious entrants," they were deemed to lack "any constitutional rights regarding their applications for admission." But they did have constitutional rights once they achieved the status of "Special Immigrant Juvenile." *Osorio*, 893 F.3d at 175-76. The court vacated the denial of the petitioners' request for injunctive review, *id*. at 179, and in the course of doing so also discussed the applicability of habeas corpus. Relying on *Boumediene v. Bush*, 553 U.S. 723 (2008), the court explained:

> In *Boumediene*, the Supreme Court took care to explain that habeas review is "most pressing" in the case of executive detention, as opposed to where "relief is sought from a sentence that resulted from the judgment of a court of record." *Boumediene*, 553 U.S. at 782-83. For the writ to be effective in such a case, "[t]he habeas court must have sufficient authority to conduct a meaningful review of both the cause for detention and the Executive's power to detain." *Id*. at 783; *see also INS v. St. Cyr*, 533 U.S. 289, 301, 121 S. Ct. 2271, 150 L. Ed. 2d 347 (2001) ("At its historical core, the writ of habeas corpus has served as a means of reviewing the legality of Executive detention, and it is in that context that its protections have been strongest."). More specifically, the Court declared it "uncontroversial . . . that the privilege of habeas corpus entitles the prisoner to a meaningful opportunity to demonstrate that he is being held pursuant to 'the erroneous application or interpretation' of relevant law." *Boumediene*, 553 U.S. at 779 (quoting St. Cyr, 533 U.S. at 302).

*Id*. at 177. In short, the cases support Petitioners' right to apply for habeas relief. Nothing in either case suggests that a noncitizen who happens to be on a vessel in a U.S. port in the course of international commerce can be imprisoned indefinitely and deprived of liberty without any due process – or that the remedy of habeas corpus is unavailable to such a crewman. To the

contrary, the right to rejoin one's immediate family is "a right that ranks high among the interests of the individual." *Landon v. Plasencia*, 459 U.S. 21, 34 (1982).

Indeed, courts routinely recognize that alien seamen have constitutional rights. For example, "the cases dealing with the constitutional rights of such seamen have recognized that alien seamen serving aboard American vessels bound out of the United States should not be treated differently and worse than if they had remained idly in port. *See, e.g.*, *Kwong Hai Chew v. Colding*, 344 U.S. 590, 73 S.Ct. 472, 97 L.Ed. 576 (1953); *Roggenbihl v. Lusby*, 116 F.Supp. 315."(D. Ma. 1953); *Shio Han Sun v. Barber*, 144 f. Supp. 850, 851 (N.D. Cal. 1956).

As Petitioners have previously briefed, crewmen have long been deemed the wards of U.S. admiralty courts. See, e.g., *Chandris, Inc. v. Latsis*, 515 U.S. 347, 354-55 (1995). Suggesting they have no due process rights is anathema to that notion, and finds no support in any case law.

Under Supreme Court jurisprudence, all persons within the territory of the United States are entitled to due process of law, including aliens. *Wong Wing v. United States*, 163 U.S. 228, 238 (1896); see also United States v. Valsys, 524 U.S. 666, 671 (1998); Landon v. Plasencia, 459 U.S. 21, 32-33 (1981); *Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 (1953). Indeed, "aliens, both legal and illegal, are entitled to due process." *Cholak v. United States*, 1998 U.S. Dist. LEXIS 7424, *18 (E.D. La. May 15, 1998), *citing Mathews v. Diaz*, 426 U.S. 67, 77 (1976); *Plyler v. Doe*, 457 U.S. 202, 210 (1982). An alien's right to due process of law is the most significant check on the executive branch's "plenary" power over aliens. See *Hermanowski v. Farquharson*, 39 F. Supp. 2d 148, 156 (D.R.I. 1999) ("The power of executive branch officers to detain aliens pending deportation pursuant to a statutory grant of authority is not without limits. This power, like most powers of government, is subject to the counter-weight of due process").

It is obvious that "detention is a deprivation of liberty." *Nguyen v. Fasano*, 84 F. Supp. 2d 1099, 1110 (S.D. Cal. 2000).  Indeed, "freedom from physical restraint -has always been at the core of liberty protected by the Due Process Clause from arbitrary government action." *Kansas v. Hendricks*, 521 U.S. 346, 356 (1997), *quoting Foucha v. Louisiana*, 504 U.S. 71, 80 (1992).  "In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Whether a particular detention is constitutional depends mainly on its purpose.  See *Schall v. Martin*, 467 U.S. 253, 268-69 (1984).  One court has explained:

> As a general rule, government invasions of fundamental liberty interests are subject to strict scrutiny review: a deprivation will comport with due process only if it is narrowly tailored to serve a compelling government interest.  Applying this standard of review in detention cases, courts consider whether the detention is "imposed for the purpose of punishment or whether it is merely incidental to another legitimate governmental interest."  This requires the Court to consider the constitutionality of the detention in light of its purpose, and to ask whether the detention is based upon "permissible" regulatory goals of the government and, if it is, whether the detention is excessive in relation to those goals.

*Phan v. Reno*, 56 F. Supp. 2d. 1149, 1154 (W.D. Wash. 1999).

The government is essentially arguing that it can defeat habeas corpus by the easy expedient of obtaining an ex parte material witness arrest warrant, including warrants for an unspecified "investigation" of untold length.  Sadly, the government has proven in this case just how easily it can secure material witness arrest warrants – by obtaining a warrant for Petitioner Gafar's arrest without even mentioning his name in its supporting affidavit and by securing others with scarcely more information.

## II.     The Issuance of Warrants Does Not Preclude Habeas Relief and an Improperly Issued Warrant is an Appropriate Basis for Such Relief.

As demonstrated previously, it is no defense to a habeas petition that the conditions of restraint have been altered, so long as the petitioner is still subject to restraints "not shared by the public generally."  See *Piasecki v. Court of Common Pleas*, 2019 U.S. App. LEXIS 5979 (3d

Cir. Feb. 27, 2019). The writ applies when the petitioner "is in custody under or by color of the authority of the United States . . ." 28 U.S.C. § 2241. Even an unconditional release does not necessarily moot a pending habeas petition. *See Carafas v. La Vallee*, 391 U.S. 234 (1968); *see also Sibron v. New York*, 1968, 392 U.S. 40, 88 S. Ct. 1889, 1912, 20 L. Ed. 2d 917 (appellant had served his six-month sentence and was released before he was able to present his case on appeal, but the Court nevertheless rejected a mootness contention); *United States v. Franzen*, 675 F.2d 870 (7th Cir. 1982) (petition for writ of habeas corpus is not rendered moot by commutation of petitioners sentence for misdemeanor conviction so long as collateral consequences of conviction exist); *Bacon v. United States*, 449 F.2d 933 (9th Cir. 1971) (fact that petitioner was detained in custody on contempt charges, arising subsequent to bringing petition for release from custody as material witness by writ of habeas corpus, does not render writ action moot or premature); *U.S. v. Russell*, 252 F. Supp. 70 (M.D. Pa. 1966)(person on parole is "in custody" and matter of habeas corpus is not moot by reason of parole). Were it otherwise, the "Great Writ" would be nugatory, for it is scarcely difficult for the government to characterize virtually any detainee as a "material witness" to some possible offense.

To the extent Respondents argue that arrest warrants universally preclude habeas relief, Respondents are again mistaken. Respondents rely on *Workman v. Cardwell*, 471 F.2d 909 (6th Circ. 1972), wherein the Sixth Circuit *affirmed* the issuance of a writ of habeas corpus. In *dicta*, the court indicated that where a prisoner had brought a petition following his conviction, and did not allege that that evidence obtained incident to his arrest was used at trial or that his trial was otherwise affected by a purportedly defective arrest warrant, he could not challenge the validity of the underlying arrest warrant in the habeas proceeding. *Id*. at 910-11. In that context the dicta was plainly correct since an illegal arrest, without more, does not bar prosecution or conviction. *See U.S. v. Crews*, 445 U.S. 463, 474 (1980). Nothing in the decision, however, suggests that a

habeas petition cannot be used to challenge a detention that is initiated or prolonged by an improperly obtained material witness arrest warrant. Instead, the decisions actually on point expressly permit habeas petitions challenging the validity of a material witness (or other) arrest warrant or the conditions of detention. *See, e.g., Bacon v. United States*, 449 F.2d 933, 943 (9th Cir. 1971) (material witness arrest warrant held invalid in habeas challenge); *In re Class Action Application for Habeas Corpus*, 612 F. Supp. 940, 945 (W.D.Tex. 1985)[addressing in habeas petition matter the right to counsel of aliens entering illegal and detained as material witnesses]; *In re Lewellyn*, 62 N.W. 554 (Mich. 1895) (granting writ of habeas corpus to a witness who had been arrested and jailed).

### III.    The Witness Warrants Were Improperly Issued.

The material witness warrants issued here were plainly designed to defeat the pending application, and the papers submitted to obtain them are riddled with peculiarities, material omissions, and inadequacies. The motion seeking material witness warrants is attached as **EXHIBIT G.** It seeks arrest warrants concerning a single criminal complaint. The Affidavit filed in support of it is attached as **EXHIBIT H.** It asserts that the government needs õa summonsö for the Petitionersø appearance in multiple, unidentified future proceedings and an unspecified õinvestigation.ö Neither filing disclosed that (a) petitioners had already been subpoenaed and agreed to appear in a grand jury proceeding and (b) that this habeas proceeding was pending. From statements the clerkøs office made to counsel, it is apparent the Magistrate Judge issuing the warrants was unaware of this proceeding.

*Bacon* is particularly instructive concerning the issue of material witness warrants for grand jury investigations (if that is what the government contemplates or accomplished). In that habeas proceeding, the Ninth Circuit interpreted earlier versions of the material witness statute and Federal Rule of Criminal Procedure 46(b) as allowing federal courts to issue material

witness warrants, but as requiring a probable cause showing that the arrest warrants were needed to secure the witness' appearance and that the witness' testimony would be material. The court opined that in a grand jury proceeding, "we think that a mere statement by a responsible official, such as a United States Attorney, is sufficient to satisfy" the requirement that the witness is material. The modern material witness statute, 18 U.S.C. §3144, was added in 1984 as part of the Bail Reform Act. It clearly requires that it must appear "by affidavit filed by a party that the testimony of [the] person is material." On the question of whether a warrant – and therefore custody – was necessary to secure the witness' appearance, the court held that the showing "failed to support probable cause to believe Bacon could not practicably be brought before the grand jury by a subpoena." *Bacon v. United States*, 449 F.2d at 945, and that therefore the warrant had been improperly issued.

Under the current statute, proper issuance of a material witness arrest warrant requires a showing by affidavit of probable cause to believe that a crime was committed and that it would be impracticable to secure the witness' presence by subpoena. *Arnsberg v. United States*, 757 F.2d 971, 976 (9th Cir. 1984). If the facts do not show that the witness was a fugitive or that he would be likely to flee the jurisdiction, the facts are insufficient to provide probable cause. *See id.* at 976-77. Typically, "there must be some showing that the witness will not cooperate with law enforcement efforts to obtain her testimony." *Perkins v. Click*, 148 F. Supp. 2d 1177, 1183 n. 6 (D.N.M. 2001). The judicial officer must also have probable cause to believe that the testimony of the person is material. *See id.* at 1182-83. The reason behind these requirements is that the arrest and detention of a potential witness is just as much an invasion of a person's security as if he had been arrested on a criminal charge. *Bacon v. United States*, 449 F.2d at 942; *Perkins*, 148 F. Supp. 2d at 1183. Where the requirements of section 3144 are not met, the arrest is not a reasonable seizure under the Fourth Amendment. *Perkins*, 148 F. Supp. 2d at 1183.

In addition to the omissions noted above, including the complete failure to provide any information concerning Petitioner Gafar, the Affidavit filed in support of the warrants provided insufficient basis to believe any of the supposed witnesses would not be available to testify at Chief Vastardis' trial or the grand jury proceeding.  On the risk they would refuse to honor a subpoena, the affidavit stated only, presumably intending to refer to all ten, that "[t]his material witness is a foreign national who will be outside the compulsory process of the United States if allowed to return to his country of nationality.  Accordingly, if a material witness summons is not issued at this time, the witness may be lost and not be available in any subsequent criminal proceeding."  The assertion is entirely insufficient, especially given the omission that grand jury subpoenas had been accepted.  And compulsory process to enforce them would exist, even in the unlikely event a Petitioner failed to appear.  Petitioners are pulling together the mutual aid treaties with their countries of nationality.

Of course, any and every subpoenaed witness *could* travel internationally or otherwise fail to appear.  But witnesses are not routinely arrested based on such speculation.  Additionally, the affidavit references the need for "summonses," the government's motion sought and the Court issued arrest warrants.  And the affidavit asserts that the Petitioners may be needed for unidentified "subsequent criminal proceeding[s]."  Section 3144, however, is available only to "a party . . . in a criminal proceeding."  It does not contemplate arresting witnesses and holding them for whatever criminal proceeding may arise in the future.

The government employs such broad use of material witness arrest warrants – like "agreements on security, pledging human collateral *only* against foreign crewmen: to hold them indefinitely and to see what cases may develop down the road.

Also missing from the affidavit was the required proof that Petitioners' testimony "is material in a criminal proceeding."  As Petitioners understand the affidavit, the government

charges that Petitioner Vastardis may have operated the vessel's oil-water separator (OWS) outside the United States with a valve in a position the government believes would have allowed tap water (rather than sample water) to pass through the censor that triggers a three-way valve to prevent discharge if too much oil is detected. As the affidavit states, Petitioner Vastardis admits and admitted that he operated the OWS and that he controlled the position of the valve. [¶14(c).] The affidavit asserts or implies that Petitioner Vastardis admitted he in effect tricked the sensor with fresh water.

The government's theory seems that the ten petitioners it seeks indefinitely to detain may have witnessed the alleged trickery and may have noted the position of the valve while the OWS was operated. The affidavit asserts that two of the Petitioners observed the sample valve "cracked" open during OWS operations – and it speculates about other Petitioners. The valves on the OWS are depicted in **EXHIBIT I**. None of the Petitioners believes the system was tricked, nor has any of them said any such thing to the government. Any speculation that Petitioners might have noted the position of these small valves – or understood the significance of their position – borders on ludicrous and is *not* supported by the affidavit.

As noted above, the Affidavit contains no information about Petitioner Gafar. The bases to arrest *ten* Petitioners are set forth in the *nine* subparagraphs of paragraph 22 – subparagraphs (a) through (i). There is no subparagraph for Mr. Gafar, nor does his name appear anywhere in the affidavit. As to the others, the affidavit purports to summarize recorded statements the Coast Guard secured onboard. (The implicit assertion that senior crew were present and might have suppressed information during the interviews is false; all interviews were conducted privately.)

As to Petitioner Diudea-Sinea, the Affidavit states that he did not operate the OWS. It implies that he did not see it in operation. The affidavit asserts that he commented on what he

observed concerning OWS operations "on other ships," but says nothing about what he observed about the OWS's operation on the EVRIDIKI.

As to Petitioner Sanchez, the Affidavit states that his duty "would require him to *pass by* the OWS system" and that "while his role did not involve operation of the OWS, he did on occasion observe its operation." The Affidavit, however, includes no suggestion that Mr. Sanchez noted anything alarming or suspicious about that operation or that he had any reason to suspect any pollution occurred. He does not.

The Affidavit states that Petitioner Agbing's duties "would require him to pass by the OWS system" and that "the Chief Engineer operates the OWS system." He did not suggest or imply that he ever observed anything unusual about the operation or that he believe any pollution event occurred. He does not.

As to Petitioner Regadillo the affidavit again states he would "pass by the OWS system" and that he "observed the Chief Engineer and the 2nd Assistant Engineer operate the OWS." Again, however, Petitioner Regadillo has no reason to suspect – and does not suspect – the system was operated improperly or caused any pollution.

The Affidavit at least implies (correctly) that Petitioner Villon was never involved in operating the OWS. It includes no assertion he said or believed it was operated so as to cause pollution. He in fact has no such opinion.

As to Master Katsolis, the Affidavit *speculates* that he might have knowledge of past problems with the OWS, even though he told the Coast Guard he had none. Ship Captains are infrequently in the engine spaces, and Captain Katsolis never saw the OWS in operation before the vessel's arrest in this matter. The affidavit correctly asserts that he can authenticate ship documents. But, respectfully, we do not arrest human beings in this country and hold them for months to authenticate documents. Affidavits suffice.

The reality is that the government routinely casts a broad net when it demands human collateral in "agreements on security," and it did so here. As previously documented, the Petitioners previously agreed to appear pursuant to grand jury subpoenas, but they also requested an opportunity in advance of the grand jury date to answer questions under oath on these topics. If the government wanted to ask a few follow up questions (or an initial question of Petitioner Gafar) it could have used the opportunity to test the possibility some Petitioner might have relevant information. The government did not even respond, perhaps because of indifference to the human suffering this process inflicts – or perhaps to maximize the costs and leverage against target entities that agree to pay the cost of holding the human collateral they post.

The issuance of warrants for these upstanding crewmembers' arrest was improper, inconsistent with the material witness statute, and a clear and inappropriate attempt to bypass this habeas proceeding. With due respect to the Magistrate Judge, who doubtless is diligent and careful, the warrants were obviously issued hurriedly, perhaps premised on the notion that the government acts prudently. The Magistrate Judge was not told and did not know that this habeas proceeding was pending.

## CONCLUSION

The Court should grant the requested writs, release the Petitioners from custody and strike the warrants. Alternatively, the Court should fashion appropriate relief to ensure that the Petitioners' freedom is not unnecessarily restricted and that they are free either to remain onboard the vessel or to travel to their home countries except as genuinely needed to testify in a pending matter. In any and all events the Court should require that to the extent testimony is

compelled it is provided under immunity and without unnecessary disruption to the Petitioners' personal and professional lives.

Dated: April 14, 2019

**BARNARD MEZZANOTTE PINNIE AND SEELAUS, LLP**

**Of Counsel:**

/s/ Anne Kai Seelaus

/s/ Edward S. MacColl

Anne Kai Seelaus (Bar No. 4970)

Edward S. MacColl (*pro hac vice*)

222 Delaware Ave., 7th Floor

**Thompson, MacColl & Bass, LLC, P.A.**

P.O. Box 26304

15 Monument Square, 4th Floor

Wilmington, DE 19899

P.O. Box 447

Telephone: (302) 552-2939

Portland, ME 04112-0447

Facsimile: (302) 574-7401

(207) 774-7600

kseelaus@bmplaw.net

(*for all Petitioners other than Nikolaos Vastardis*)

*Attorneys for all Petitioners*

emaccoll@thomport.com

NIKOLAOS KATSOLIS, PANAGIOTIS          )
MATHESIS, EDWARD BARNACHEA          )
FLORES, RICHARD DAGASDAS          )
CABARUBIAS, SPYROS          )
ADRAMITOGLOU, NIKOLAOS          )
BOGIAKIS, NIKOLAOS VASTARDIS,          )          CASE No: 1:19-CV-00616-RGA
NILO GANADILLO LUNETA, ALY          )
HASSAN REFAEY HASSAN, DENNIS          )
LIBRANDO VILLON, STAVROS          )
LYMPERIS, JUANITO DUMAPAY STA.          )
MARIA, MARIUS-OCTAVIAN DIUDEA-          )
SINEA, CHRYSOSTOMOS PAGONIS, LEO          )
ABUAN LAIGO, LESTER BALOG          )
MARASIGAN, NORMAN ARBOL          )
MELGAZO, RONILO SALAZAR SEVILLA,          )
LOPE CONSTANTINO TORRES,          )
CHRISTIAN LOS BANES ANGURING,          )
JOHN KIRBY NOVAL DOLDOLEA, DEN          )
ISRAEL MAHILAC, JESS TORNEA          )
BENDICIO, MARK ANTHONY          )
SUARNABA JUELAR, ZALDY LARESMA          )
REGADILLO, MARLON CARINGAL          )
AGBING, FELMAR VALENCIA          )
SANCHEZ, ABDOU SHEHATA BAHNASSI          )
ASHRAF, VICTOR MICHAEL GALAN          )
CABELLON, AR-JAY PINEDA CAUSAPIN,          )
NINO DELA TORRE HERMONO, JEMAR          )
BACASON SESCON, and SAGIT GAFAR,          )
          )
          *Petitioners,*          )
          )
v.          )
          )
KEVIN K. MCALEENAN and          )
UNITED STATES COAST GUARD,          )
          )
          *Respondents*          )

## **ORDER**

AND NOW, this _____ day of _____, 2019 upon consideration of the Petition for Writs of Habeas Corpus Pursuant to 28 U.S.C. 2241, Respondents' Opposition thereto and Petitioners' Reply in support thereof, it is ORDERED that the Petition for Writs of Habeas Corpus Pursuant to 28 U.S.C. 2241 is **GRANTED.** Writs of Habeas Corpus are hereby issued for the remaining twenty-nine (29) named Petitioners.[1]

The April 11, 2019 the Material Witness Warrants issued to Petitioners Marlon Caringal Agbing, Marius-Octavian Diudea-Sinea, Sagit Gafar, Nikolas Katsolis[2] *(sic)*, Nilo Ganadillo Luneta, Hassan Aly Hassan Refaey[3] *(sic),* Zaldy Laresma Regadillo, Felmar Valencia Sanchez, Juanito Dumapay Sta. Maria and Dennis Librando Villon are hereby **VACATED.**

IT IS SO ORDERED.

_____
**RICHARD G. ANDREWS**
**UNITED STATES DISTRICT COURT JUDGE**

---

[1] The Writs requested on behalf of Petitioners Richard Dagasdas Cararubias, Christian Los Banes Anguring, Jess Tornea Bendicio and Victor Michael Galan Cabellon are now Moot.
[2] Petitioner's name is Nikolaos Katsolis.
[3] Petitioner's name is Aly Hassan Refaey Hassan.